UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

| | |
|---|---|
| GREGORY G. SAMUELSON | ) |
| | ) |
| Plaintiff | ) |
| | ) |
| v. | ) CAUSE NO.3:05-CV-99 RM |
| | ) |
| LAPORTE COMMUNITY SCHOOL | ) |
| CORPORATION, KENNETH BLAD, individually | ) |
| and in his official capacity as superintendent | ) |
| of schools, MITCH FEIKES, individually and in | ) |
| his official capacity as Trustee, TOM | ) |
| DERMODY, individually and in his official | ) |
| capacity as Trustee, RUTH MINICH, | ) |
| individually and in her official capacity as | ) |
| Trustee, CAROL SHINN, individually and in | ) |
| her official capacity as Trustee, RON | ) |
| GIGLIOTTI, individually and in his official | ) |
| capacity as Trustee, SUSAN SZILAGYI, | ) |
| individually and in her official capacity as | ) |
| Trustee, MARY MCDERMOTT, individually | ) |
| and in her official capacity as Trustee, | ) |
| | ) |
| Defendants | ) |

<u>OPINION and ORDER</u>

Gregory G. Samuelson sues the LaPorte Community School Corporation and the members of its School Board, alleging that the school's chain-of-command policy constitutes a prior restraint in violation of his First Amendment rights. He further alleges that his contract to coach the high school girls' basketball team was not renewed in retaliation for his exercising his First Amendment right to public speaking. After the conclusion of discovery, Mr. Samuelson moved for summary judgment on his First Amendment prior restraint claim. The defendants

moved for summary judgment on Mr. Samuelson's First and Fourteenth Amendment claims as well as his claims arising under the Indiana Constitution. The defendants also filed a motion to strike certain evidence relied on by the plaintiff. For the reasons set forth below, the court grants the defendants' summary judgment motion and denies the defendants' motion to strike and plaintiff's summary judgment motion as moot.

## I. Factual Background

In 1992, Mr. Samuelson was hired as a teacher by the LaPorte Community School Corporation and is still currently employed in that position. Mr. Samuelson also has coached several sports over the years, including softball and basketball. As a LaPorte Community School Corporation employee, Mr. Samuelson is subject to the schools' chain-of-command policy that requires employees to address their grievances with the supervisor of that area before airing those grievances to the School Board. The chain-of-command policy states:

> All staff members shall be responsible to the Board through the Superintendent. Each shall refer matters requiring administrative action to the person in charge of the department, who shall refer such matters to the next higher authority, when necessary.

> All staff members have the right to appeal any decision made by an administrative officer, through approved procedures as defined by contract, agreements, policies, administrative guidelines, or by State law.

During his tenure at LaPorte, Mr. Samuelson has aired his opinions regarding issues affecting the LaPorte Community School Corporation directly to School Board members and other community members without first addressing these concerns with the appropriate supervisor. In 1993, Mr. Samuelson co-founded the Girls Athletic and Academic Club, which focused on issues affecting girls' athletics such as funding. In 1995, some members of this group (not Mr. Samuelson) filed a Title IX complaint against the LaPorte Community School Corporation. Mr. Samuelson also spoke to School Board member Ruth Minich in 2003 about the proposed school redistricting. Mr. Samuelson addressed the School Board and individual members about the hiring of principals and assistant principals, specifically the hiring of Ms. Gwen Taylor, and the proposed change from a dual platform computer system that was compatible with both Macintosh and PC's to a single platform system that only supports PC's.

In 1999, Mr. Samuelson was named LaPorte High School Girls' Basketball Head Coach. In the 2000-2001 season, Mr. Samuelson's team won its first Class 4-A sectional championship, its first regional championship and advanced to the semi-state round of the Indiana State High School Athletic Association tournament. On March 8, 2001, 28 girls from the girls' basketball program signed a petition that they delivered to members of the School Board specifically requesting the Board not renew Mr. Samuelson's coaching contract for the 2001-2002 season. This petition was followed by a petition signed by more than 70 representatives of families in the LaPorte High School District requesting Mr.

3

Samuelson's dismissal as Girls' Varsity Coach. On April 10, 2001, the School Corporation (through Assistant Superintendent Adams) formally requested Mr. Samuelson's resignation. The Board did not request his resignation.

Mr. Samuelson remained as head coach. The team won 6 games and lost 15 in the 2001-2002 season. The next year, after the team lost to Valparaiso High School on January 10, 2003, one of the player's parents, Mr. Marovich, engaged Mr. Samuelson in an altercation that resulted in Mr. Marovich's ban from attending games. On January 30, 2003, Mr. Samuelson was ordered by his doctor to be "out of coaching indefinitely" due to the stress of the incident. Following the incident, all 13 members of the Girls' Varsity team signed a petition stating: "We the members of the 2002-2003 LaPorte Lady Slicer Basketball Team refuse to play under the coaching of Head Coach Greg Samuelson due to his incompetence and lack of respect towards his players."

On February 12, 2003, Principal Handel recommended that the Board not renew any of the coaching contracts for any of the girls basketball coaching staff due to the player and parental discontent. Around that same time, Superintendent Blad prepared an agenda review for the School Board of Trustees in which he recommended non-renewal of Mr. Samuelson's contract.

On February 14, 2003, Mr. Samuelson wrote an email to Assistant Superintendent Adams and Superintendent Blad inquiring as to the proper method by which to file a Title IX suit. Mr. Samuelson stated: "I believe that the LaPorte Community School Corporation and some of its staff and administrators

4

have inadequately applied the principles and/or regulations of Title IX of the Education Amendment Act of 1972." Mr. Samuelson also asked about available protection from retaliation: "In the filing of any complaint or grievances under Title IX, will I be protected from any type of retaliation towards my teaching or coaching assignment on the part of the LaPorte Community School Corporation because of any past or present connection to any Title IX complaints or grievances."

In response to this email and other grievances, Superintendent Blad composed a memo to Mr. Samuelson dated September 17, 2003. This memo addressed Mr. Samuelson's speaking to newspapers, Board members and private citizens about "harassment" without following the harassment procedures outlined in the policy, Mr. Samuelson's opposing the platform change without addressing his concerns to the appropriate staff member, fund raising concerns, failure to follow the chain-of-command policy and his negative relationship with parents. The memo instructed Mr. Samuelson to: "follow the chain-of-command that is outlined in Board policy. That means that should you take issue with an administrative directive or experience a problem, you will discuss the problem with your Department Chair, Personnel Director and/or Superintendent." Superintendent Blad warned Mr. Samuelson to, "not directly contact Board members without first following the chain-of-command!" In conclusion, Superintendent Blad said that should Mr. Samuelson fail to abide by the rules laid out in the memo disciplinary action would be taken, "up to, and including, the recommendation for termination to the Board of School Trustees."

On February 18, 2003, the School Board—Mitch Feikes, Tom Dermody, Carol Shinn, Ron Gigliotti, Susan Szilagyi and Mary McDermott—unanimously voted not to renew Mr. Samuelson's coaching contract for the high school girls' basketball team. The one Board member abstaining from the vote was Ruth Minich.

In 2004, Mr. Samuelson wasn't selected for the eighth grade basketball coaching position at LaPorte Schools even though he was the only applicant.

On February 17, 2005, Mr. Samuelson filed this lawsuit, alleging that the LaPorte Community School Corporation, through its chain-of-command policy, violated his First Amendment rights: he alleges that the chain-of-command policy constitutes an unconstitutional prior restraint. He further alleged that his coaching contract hadn't been renewed in retaliation for his speaking out on matters of public importance concerning the LaPorte Community School Corporation.

Lastly, Mr. Samuelson alleged that these actions deprived him of due process, the privileges and immunities guaranteed to him by the Fourteenth Amendment and his right to free thought, speech, writing and printing in violation of Article 1 Section 9 of the Indiana Constitution. Mr. Samuelson hasn't further addressed either of these last three claims in any of the briefs before the court.

II. DISCUSSION

Summary judgment is appropriate when "the pleadings, depositions, answers to the interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c). In deciding whether a genuine issue of material fact exists, "the evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986). No genuine issue of material fact exists when a rational trier of fact could not find for the nonmoving party even when the record as a whole is viewed in the light most favorable to the nonmoving party. O'Neal v. City of Chicago, 392 F.3d 909, 910-911 (7th Cir. 2004). A nonmoving party cannot rest on the mere allegations or denials contained in its pleading to overcome a motion for summary judgment. The nonmoving party must point to enough evidence to show the existence of each element of its case on which it will bear the burden at trial. Celotex v. Catrett, 477 U.S. 317, 322-323 (1986).

Analysis begins with whether the chain-of-command policy constituted a prior restraint. If so, the government must then "demonstrate that the interests of both potential audiences and a vast group of present and future employees in a broad range of present and future expression are outweighed by that expressions' 'necessary impact on the actual operation' of the Government." Crue v. Aiken, 370 F.3d 668, 678 (7th Cir. 2004) (quoting United States v. National Treasury Employees Union, 513 U.S. 454, 468 (1995)).

7

The court's analysis then turns to Mr. Samuelson's retaliation claim.  When presented with a claim that a public employee has been improperly retaliated against on account of the exercise of his First Amendment rights, a court conducts a three part inquiry:

> 1) Was the plaintiff's speech constitutionally protected?
> 2) If so, were the defendants' actions motivated by the plaintiff's constitutionally protected speech?
> 3) If the plaintiff can show that his constitutionally protected speech was a substantial or motivating factor in his termination, can the defendants show that they would have taken the same action in the absence of his exercise of his rights under the First Amendment?

Vukadinovich v. Board of School Trustees of North Newton School Corp., 278 F.3d 693, 699 (7th Cir. 2002).

A

Prior restraint refers to "administrative and judicial orders *forbidding* certain communications when issued in advance of the time that such communications are to occur."  Alexander v. U.S., 509 U.S. 544, 550 (1993) (emphasis in original). Mr. Samuelson claims the chain-of-command policy had a chilling effect causing him, along with about "half a dozen" teachers, to be afraid to speak out. Mr. Samuelson submits the affidavits of former teachers Karen Bortz and Myrna Harder stating that the chain-of-command policy made them, "afraid to speak out about public issues concerning LaPorte Schools." The reason for this fear was that, according to Mr. Samuelson, "undisputed evidence" showed that the LaPorte

School Corporation's chain-of-command policy required teachers to consult with the school's administration before speaking out about public issues.

As defendants point out, however, the policy's plain text mandates that issues requiring administrative action should be brought first to the attention of the person in charge of the department. Matters that were simply of "public concern" and required no administration action would not be subject to this policy. Matters that required administrative action, and so were subject to the policy, could be appealed if not resolved to both parties' satisfaction. This right to appeal is mentioned in the conclusion of the policy. The defendants claim that had Mr. Samuelson followed the chain-of-command policy and remained unsatisfied by the administration's response, Superintendent Blad himself would have arranged a meeting with the School Board at which Mr. Samuelson could have aired his grievance.

Lastly, any member of the community, including Mr. Samuelson, could raise concerns to the School Board when the floor was opened to those remarks during a meeting. The chain-of-command policy simply forbade employees from contacting School Board members individually before first having addressed the issue with the supervisor. The memo written by Superintendent Blad on February 17, 2003, to Mr. Samuelson supports this contention: in that memo, Superintendent Blad criticizes Mr. Samuelson's "consistent failure to follow Board policy and conduct yourself professionally by using the established chain-of-command; specifically by calling, visiting and working behind the scenes to

9

influence Board member decisions without first discussing perceived problems with your immediate supervisors." Superintendent Blad's memo didn't say that Mr. Samuelson could never contact Board members; Superintendent Blad simply wanted Mr. Samuelson to first address administrative concerns with the supervisor before bringing them to the attention of the School Board during appropriate times.

This case differs in these respects from the prior restraint cases Mr. Samuelson cites, in which a governmental agency banned certain speech based on its content without offering the option to appeal. In <u>Southeastern Promotions, Ltd. v. Conrad</u>, 420 U.S. 546 (1975), a municipal board denied a production company's application to lease a city theater based on the board's collective disdain for the rock musical "Hair". The court found the action to be an unconstitutional prior restraint since the denial of the license was based on the content of the production and the decision was final. <u>Southeastern Promotions, Ltd. v. Conrad</u>, 420 U.S. at 554. Hence, the government's rejection of the production of "Hair" satisfied the elements of an unconstitutional prior restraint:

> (1) the speaker must apply to the decisionmaker before engaging in the proposed communication; (2) the decisionmaker is empowered to determine whether the applicant should be granted permission based on his/her review of the proposed content of the communication; (3) approval of the request requires affirmative action by the decisionmaker; and (4) approval is not a matter of routine, but involves the "appraisal of facts, the exercise of judgment, and the formation of an opinion" by the decisionmaker.

Southeastern Promotions, Ltd. v. Conrad, 420 U.S. at 554. The LaPorte chain-of-command policy doesn't satisfy each of these elements. First, the policy only applies to matters requiring administrative action. That might or might not encompass most matters that an employee might want to speak out about. Second, although the LaPorte policy requires employees to speak first to the supervisor in charge, that supervisor has no right to decide whether the employee can appeal to the School Board:  if an employee is dissatisfied with the actions taken by the supervisor, he may address his concerns to the School Board without further obstacle. Too, the chain-of-command policy doesn't apply just to certain controversial matters; it is a content neutral policy applying to all matters requiring an administrative action for resolution. Third, all members of the community could address the School Board when the floor was opened to the public during the meetings. This privilege was open to Mr. Samuelson without the Superintendent taking any affirmative action. Finally, the goal of the chain-of-command policy is to stop concerns being raised to members of the School Board individually before being brought to the supervisor's attention. It is a routine procedure that promotes efficient resolution of concerns.

Mr. Samuelson also relies upon Crue v. Aiken, 370 F.3d 668 (7th Cir. 2004), in which the Chancellor of the University of Illinois issued a preclearance directive to all students who wished to contact prospective student athletes about the University's controversial mascot, Chief Illiniwek. That directive stated: "any such contacts should occur only with the express authorization of the Director of

Athletics or his designee, who have experience in these issues." Crue v. Aiken, 370 F.3d at 676. The Crue court found this policy to be an unconstitutional prior restraint: "Chancellor Aiken's directive is a broad prohibition on speech on a matter of significant importance and public concern." Crue v. Aiken, 370 F.3d at 678. In contrast, the LaPorte chain-of-command policy does not prohibit any speech based on its content; it applies to any issue that would require administrative action for resolution. After following the chain of command, the employee is free to appeal to the School Board without express authorization of the supervisor or Superintendent. It is not a prior restraint.

B

Mr. Samuelson claims his contract to coach the high school girls' basketball team was not renewed in retaliation for his engaging in protected activities under the First Amendment. Vukadinovich v. Board of School Trustees of North Newton School Corp., 278 F.3d 693 (7th Cir. 2002), set out a three-prong test to analyze such claims. First, the court decides whether the speech was constitutionally protected. Vukadinovich v. School Trustees, 278 F.3d at 699. To be constitutionally protected, speech must address matters of public concern. Kuchenreuther v. City of Milwaukee, 221 F.3d 967, 973 (7th Cir. 2000). If the plaintiff is able to clear this hurdle, he must then show that his interest as a citizen in commenting on matters of public concern outweighs the interests of the

state as an employer in promoting the efficiency of the public services it performs through its employee. <u>Kuchenreuther v. City of Milwaukee</u>, 221 F.3d at 673.

1

Matters on which Mr. Samuelson voiced his opinions in the past have included the proposed school redistricting, gender inequality in the athletic department funding, LaPorte's hiring policy, and LaPorte's technology decisions.

Whether these issues constitute matters of public concern entitled to First Amendment protection is based on "the content, form, and context of a given statement as revealed by the whole record, but content is the most important factor." <u>Smith v. Fruin</u>, 28 F.3d 646, 651 (7th Cir. 1994) (*quoting* <u>Connick v. Myers</u>, 461 U.S. 138, 147-148 (1983)).

The defendants contend that since Mr. Samuelson didn't list redistricting in his complaint as one of the issues on which he spoke publicly, he is precluded from including it in his summary judgment motion. The Federal Rules of Civil Procedure require notice pleading, not fact pleading. "Facts need not be 'established' or even alleged (fact-pleading is unnecessary); a plaintiff receives the benefit of any fact that could be established later consistent with the complaint's allegations." <u>Simpson v. Nickel</u>, 450 F.3d 303, 306 (7th Cir. 2006). Mr. Samuelson's complaint alleged that his contract to coach the high school girls' basketball team was not renewed in retaliation for his speech regarding matters

13

of public concern. The specific matters of public concern about which Mr. Samuelson had spoken didn't need to be pleaded in the complaint.

Speech consists of a matter of public concern if it addresses any matter of "political, social, or other concern to the community." <u>Kuchenreuther v. City of Milwaukee</u>, 221 F.3d 967, 973 (7th Cir. 2000). Conversely, a matter is not of public concern if it involves a personal grievance of interest only to the employee. <u>Gustafson v. Jones</u>, 290 F.3d 895, 907 (7th Cir. 2002). Redrawing school district maps would greatly affect members of the community with school age children and, albeit to a lesser extent, would concern all members of the taxpaying community. The issue garnered media attention. A teacher arguably could supply greater insight that would be helpful to the community in deciding whether to support the redistricting.

In her deposition, School Board member Ruth Minich confirmed her conversation with Mr. Samuelson would be useful to her if the issue were brought before the Board. She added that many parents and members of the media voiced opinions on this issue. This doesn't appear to be a personal grievance of interest only to Mr. Samuelson as opposed to an issue of concern to the whole community. Mr. Samuelson didn't simply air his views to a few neighbors; he sought out and shared his opinions with a person who might be asked to vote on this issue. Mr. Samuelson has shown that this issue constituted a matter of public concern.

Mr. Samuelson says he also spoke out about the gender inequality in the funding of sports at LaPorte Community School Corporation, an issue that he also

14

contends constitutes a matter of public concern. Mr. Samuelson presents his February 14, 2003 e-mail to Assistant Superintendent Adams and Superintendent Blad about the proper way to file a Title IX complaint, the founding of the Girls Academic and Athletic Club in 1993, and that the group later filed a Title IX suit against the school (even though Mr. Samuelson was not a plaintiff in that action). This issue has garnered enough attention from community members for it to qualify as an issue of public concern. The defendants allege that the February 14, 2003 e-mail was sent in response to Superintendent Blad's inquiry into Mr. Samuelson's performance as the girls' head basketball coach. Although Superintendent Blad's inquiry might have motivated that particular e-mail in whole or in part, Mr. Samuelson's actions and opinions over the last decade in promoting girls athletics constitute speech on a matter of public concern.

The other two issues Mr. Samuelson raises—the hiring of Principals and Assistant Principals at LaPorte (specifically Gwen Taylor's hiring) and the change in computer platforms at LaPorte—are not matters of public concern. "Speech by a government employee relating to ordinary matters of internal operations and lacking connection to 'any matter of political, social, or other concern to the community' is not entitled to First Amendment protection." Spiegla v. Hull, 371 F.3d 928, 936 (7th Cir. 2004) (quoting Connick v. Myers, 461 U.S. 138, 146 (1983)). Unless deplorably inadequate, the School Corporation's hiring policies and procedures are internal issues that don't rise to the level of public concerns. The hiring policies are analogous to plaintiff's objections in Connick v. Myers, 461 U.S.

15

at 149, regarding intra-office transfer policies, office morale and grievance procedures, and the Court deemed those internal office affairs and not matters of public concern. Mr. Samuelson only alludes to broaching these topics with School Board members without specifics as to what he saw wrong with the hiring policies and what procedures he proposed the school use in the future. Although Mr. Samuelson aired his opposition to the hiring of Gwen Taylor at a School Board meeting, it constituted a personal grievance on Mr. Samuelson's part rather than a public concern; no reasons have been presented as to why Ms. Taylor was so objectionable a candidate.   Lastly, the switch from a computer platform compatible with both Macintosh and PC computers to one compatible only with PCs, unless exorbitantly expensive, is an internal policy issue.

Since two of the issues raised by Mr. Samuelson in the past constitute matters of public concern, the court turns to the balancing test.

2

The government may impose restraints on the free speech of their employees if it can show that the employee's interest as citizen in commenting upon matters of public concern are outweighed by the interests of the State, as an employer, in promoting the efficiency of the public services it performs through its employees. Pickering v. Board of Educ. of Township High Sch. Dist. 205, 391 U.S. 563, 568 (1968). Courts take seven elements into consideration when applying this balancing test:

(1) whether the speech would create problems in maintaining discipline or harmony among co-workers; (2) whether the employment relationship is one in which personal loyalty and confidence are necessary; (3) whether the speech impeded the employee's ability to perform her responsibilities; (4) the time, place and manner of the speech; (5) the context in which the underlying dispute arose; (6) whether the matter was one on which debate was vital to informed decisionmaking; and (7) whether the speaker should be regarded as a member of the general public.

Gazarkiewicz v. Town of Kingsford Heights, Indiana, 359 F.3d 933, 943-944 (7th Cir. 2004).

Mr. Samuelson relies heavily on Gazarkiewicz, in which a Town Council voted to remove Mr. Gazarkiewicz from his position as a laborer in the town's public utilities department in retaliation for his ignoring the grievance procedure. Gazarkiewicz v. Kingsford Heights, 359 F.3d at 936. Instead of filing a grievance against his supervisor, Mr. Gazarkiewicz typed up a flyer written by a fellow citizen of the town, Robert Reese, criticizing the utility supervisor's job performance and that he had been appointed to that position instead of democratically elected. Reese posted the flyer at the local grocery store. Gazarkiewicz v. Kingsford Heights, 359 F.3d at 937. The court of appeals found that Mr. Gazarkiewicz's position was not one in which personal confidence and loyalty were necessary, and that there was there no evidence that his speech affected his ability to perform his responsibilities. The court also found that Mr. Gazarkiewicz was acting as a private citizen instead of as an employee when he typed up the flyer. Gazarkiewicz v. Kingsford Heights, 359 F.3d at 944. Like Mr. Gazarkiewicz, Mr. Samuelson contends that he was contacting School Board

17

members in his free time to discuss matters of public concern, that his position was not one in which personal confidence and loyalty are necessary, and that his speech was not disrupting his job performance.

In Gazarkiewicz, though, the court found that the Town of Kingsford Heights "produced no evidence that Mr. Gazarkiewicz's speech actually disrupted town affairs." Gazarkiewicz v. Kingsford Heights, 359 F.3d at 945. The LaPorte Community School Corporation had complaints from School Board members whom Mr. Samuelson was calling at home. The School Board, unlike Kingsford Heights, had disruptive conduct to corral.

Mr. Samuelson's case is more like Waters v. Churchill, 511 U.S. 661 (1994), in which a nurse in obstetrics was discharged for taking aside a trainee to convey to her how bad things were in the department and to discourage her from working there. The Supreme Court didn't need to decide whether the nurse's speech was of public concern, since it held that the potential disruptiveness of the speech as reported was enough to outweigh whatever First Amendment value it might have had.  Waters v. Churchill, 511 U.S. at 680.

> The government's interest in achieving its goals as effectively and efficiently as possible is elevated from a relatively subordinate interest when it acts as sovereign to a significant one when it acts as employer.  The government cannot restrict the speech of the public at large just in the name of efficiency.  But where the government is employing someone for the very purpose of effectively achieving its goals, such restrictions may well be appropriate.

Waters v. Churchill, 511 U.S. at 675. The Court further found that the plaintiff's actions were disruptive enough to warrant dismissal.

> Government agencies are charged by law with doing particular tasks. Agencies hire employees to help do those tasks as effectively and efficiently as possible.  When someone who is paid a salary so that she will contribute to the agency's effective operations begins to do or say things that detract from the agency's effective operation, the government employer must have some power to restrain her.

Waters v. Churchill, 511 U.S. at 674-675.

The LaPorte Community School Corporation asserts that it implemented and enforced its chain-of-command policy to prevent the influx of small administrative complaints to the School Board when such problems would be addressed more easily by the person in charge of the department at issue. There seems to have been a need for this policy since several Board members complained after receiving calls from Mr. Samuelson regarding LaPorte Community School issues.  This appears to be the same sort of efficiency-promoting restriction on speech approved in Waters and which a governmental employer may employ. Again, other, less disruptive avenues for conveying his views, were available to Mr. Samuelson.

Given the narrow restriction that was adopted, the school corporation's interest in promoting the efficiency of the public services it performs outweighed Mr. Samuelson's interest in speaking directly to Board members on these matters of public concern.

3

Even if the balancing test produced a different result, and even if Mr. Samuelson's speech was found to be a motivating factor in his discharge, the defendants still would prevail because they have provided ample evidence that they would have still not renewed his contract regardless of the protected speech.

The defendants would bear the burden of proving by a preponderance of the evidence that Mr. Samuelson would have been terminated regardless of the protected speech. Vukadinovich v. Board of School Trustees of North Newton School Corp., 278 F.3d 693, 699 (7th Cir. 2002). "In the summary judgment context, this means that [Mr. Samuelson] has to show that a rational finder of fact could infer that the defendants' stated reasons for firing him were lies." Vukadinovich v. School Trustees, 278 F.3d at 699.

The defendants point to the recommendations of Superintendent Blad, Director of Athletics Gilliland, and Principal Handel as well as the Board's affidavits in support of their contention that Mr. Samuelson's contract was not renewed because of the general discontent of parents and players that had been brewing for several years and had finally culminated in a physical altercation between a parent and Mr. Samuelson and the player's boycott. That discord gave the Board ample reason to not renew Mr. Samuelson's contract regardless of his speech on redistricting and Title IX. Superintendent Blad submitted an agenda review to the board containing his recommendation not to renew Mr. Samuelson's contract. In that agenda, Superintendent Blad based his recommendation on the girls basketball program's dysfunctionality, the numerous complaints the

20

superintendent had received from players and parents about Mr. Samuelson's coaching, Mr. Samuelson's inability to handle the fund-raising activities, and Mr. Samuelson's unwillingness to function within a team. The sole mention of the chain-of-command policy related to Mr. Samuelson's purchasing new team uniforms without permission of the athletic director or principal.

Athletic Director Gilliland's recommendation addressed the dissatisfaction of Mr. Samuelson's players, his mismanagement of money, the lack of fundamentals in the girls' basketball program, his antagonistic attitude towards his assistant coaches and the parents, and the lack of organization. Mr. Gilliland noted Mr. Samuelson's failure to follow the chain-of-command policy, but not with respect to any specific issue: "In the past, Greg has been known to by-pass the Athletic Director, Principal and Superintendent and go to school board members with problems."

Principal Handel's recommendation to the Board also focused on the player's lack of morale evidenced by their threat to forfeit a game rather than to play for Mr. Samuelson and the complaints he received from parents. Mr. Handel also mentioned Mr. Samuelson's failure to follow the chain-of-command policy, but not in terms of any particular issue.

> Mr. Samuelson has rarely followed the established chain of command when dealing with any issue.  His normal procedure in the past has been to contact board members directly before talking with the Athletic Director or Principal.  This is unfortunate and eliminates the problem solving potential of the above personnel from the equation

Each of the Board members who voted not to renew Mr. Samuelson's contract, testified that they had no knowledge of the plaintiff's position on any of the public matters he spoke about. Instead, as Ms. Shinn stated in her affidavit:

> The only discussion regarding these issues centered around the fact that the girls did not want to play for Coach Samuelson, the complaints by the parents concerning the team and the way their daughters were being treated and instructed.  There was never any discussion on any other issue involving Greg Samuelson, including any issue involving computers, principals or other lawsuits against LaPorte Community Schools.

Mr. Samuelson may show that these reasons are pretext, and not the motivating factor behind the non-renewal of his contract, either directly, "with evidence showing that retaliation was the most likely motive for terminating him", or indirectly, "by showing that the defendants' proffered justifications were not worthy of credence". <u>Vukadinovich v. School Trustees</u>, 278 F.3d at 699. To show pretext indirectly, Mr. Samuelson must show that: "1) the defendants' justifications have no basis in fact, 2) the justifications were not the real reason for firing him, or 3) the justifications were insufficient to warrant his termination." <u>Vukadinovich v. School Trustees</u>, 278 F.3d at 699.

Mr. Samuelson cannot prove pretext directly since there is evidence that his players refused to play under him and of parental discontent. Either would justify a decision by the Board to not renew Mr. Samuelson's coaching contract. In <u>Vukadinovich</u>, a teacher was dismissed for insubordination and neglect of duty after having a letter published by the local paper decrying the actions of the superintendent and school board. Although the court found that the teacher had

engaged in protected conduct, his later neglect to follow the directives issued by the principal justified his dismissal. <u>Vukadinovich v. School Trustees</u>, 278 F.3d at 696.

Mr. Samuelson cannot prove pretext indirectly, because his assertions are not backed up by the evidence. Mr. Samuelson points to the timing of the non-renewal as evidence of pretext: Mr. Samuelson's contract was not renewed two days after he sent the e-mail regarding his possible Title IX action and the day after he received the memo from Superintendent Blad warning him of the potential consequences of his continued violation of the chain-of-command policy. The altercation that got the ball rolling towards the non-renewal of his contract, though, happened before his email regarding a possible Title IX action. Principal Handel's recommendation was written two days before Mr. Samuelson wrote that email, and so couldn't have been in retaliation for Mr. Samuelson's email about a possible Title IX suit.

Mr. Samuelson has produced no evidence that any Board member that voted on his non-renewal was aware of his position on a possible Title IX lawsuit or the proposed redistricting. The only Board member who could be found to been aware of Mr. Samuelson's position on redistricting abstained from the vote.

Mr. Samuelson also points to what he sees as disparate treatment he received compared to other coaches who won fewer games and received more complaints. Mr. Samuelson refers to the treatment of tennis coach Bill Reed who was the subject of allegedly dozens of serious parental and athletic complaints, yet

received a full hearing before the Board. Mr. Samuelson hasn't produced any evidence, though, that Mr. Reed was involved in an altercation with a parent or that his players refused to play for him.

No reasonable jury could find that the stated reason for the decision not to renew Mr. Samuelson's contract—dissatisfaction of players and parents and his general disregard for school policy — was pretextual. The defendants are entitled to judgment as a matter of law on Mr. Samuelson's claim for retaliatory discharge.

## II. CONCLUSION

Since the chain-of-command policy does not constitute a prior restraint, the defendants are entitled to summary judgment on Mr. Samuelson's First Amendment claim. Since the non-renewal of Mr. Samuelson's coaching contract would have happened regardless of his protected speech, the defendants are entitled to summary judgment on Mr. Samuelson's retaliation claim. Finally, since Mr. Samuelson has presented no evidence on his Fourteenth Amendment privileges and immunities or due process claims or on his claims arising under the Indiana Constitution, the court grants the defendants' motion for summary judgment on those claims. Since no genuine issues of material fact remain, the court GRANTS defendants' summary judgment motion (Doc. No. 76). The court further DENIES plaintiff's motion for summary judgment [Doc. No. 35] and defendants' motion to strike (Doc. No. 82) as moot.

SO ORDERED.

ENTERED:   November 17, 2006

           /s/ Robert L. Miller, Jr.
Chief Judge
United States District Court